UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMIE HODGES and ON THE MOVE LTD,

                    Plaintiffs,

      -against-

JAMES EARLY, IRISH DANCING TEACHERS
ASSOICATION OF NORTH AMERICA-MID-
ATLANTIC REGION, INC., MOLLY KATHLEEN
LUTWIN, FRANCIS ACADEMY OF IRISH DANCE
and KEITH L. LABIS,

                  Defendants.

20-cv-9878(ALC)(KHP)

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS JAMES EARLY, IRISH DANCING TEACHERS ASSOICATION OF NORTH AMERICA-MID-ATLANTIC REGION, INC. AND  KEITH L. LABIS' MOTION TO DISMISS**

CATAFAGO FINI LLP
The Empire State Building
350 Fifth Ave., Suite 7710
New York, NY  10118
Tel.: (212) 239-9669

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 4

ARGUMENT ......................................................................................................... 15

I.   THE COMPLAINT ADEQUATELY ALLEGES EXCEPTIONS TO THE EARLY DEFENDANTS' "COMMON INTEREST DEFENSE" – A DEFENSE WHICH RAISES FACT ISSUES THAT CANNOT BE RESOLVED ON THIS MOTION TO DISMISS GIVEN THE COMPLAINT'S WELL-PLED ALLEGATIONS ........... **Error! Bookmark not defined.**

  A.   Courts Have Cautioned Against Dismissing Complaints Based On The Common Interest Privilege At The Pre-Answer Motion To Dismiss Stage ...................................... 16

  B.   The Complaint More Than Adequately Alleges That The Early Defendants "Excessively Published" Their Defamatory Statements .................................................... 17

  C.   The Complaint More Than Adequately Alleges Malice ............................................ 20

II.   PLAINTIFFS' DEFAMATION CLAIM AGAINST DEFENDANT LABIS IS SUFFICIENTLY ALLEGED ................................................................................... 22

III.   PLAINTIFFS' TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS CLAIM IS SUFFICIENTLY ALLEGED ...................................................... 23

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Bertuglia v. City of New York,* 839 F.Supp.2d 703 (S.D.N.Y. 2012)..........................................23

*Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373 (1995) .....................................................22

*Cojocaru v. City University of New York*, 2020 WL 5768723 (S.D.N.Y. Sept. 28, 2020)...........23

*Conti v. Doe*, 2019 WL 952281 (S.D.N.Y. Feb. 27, 2019) .........................................................16

*ExpertConnect, LLC v. Fowler*, 2020 WL 3961004 (S.D.N.Y. Jul. 13, 2020).......................2, 16

*James v. DeGrandis*, 138 F.Supp.2d 402 (W.D.N.Y. 2001).......................................................17

*Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92 (2d Cir. 2000) ..........................................17

*Macineirghe v. County of Suffolk*, 2015 WL 4459456 (E.D.N.Y. July 21, 2015) ......................22

*Menaker v. C.D.*, 2018 WL 5776533 (E.D.N.Y. Nov. 1, 2018) .................................................16

*Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F.Supp.3d 240 (S.D.N.Y. 2014) ..................................22

*Parneros v. Barnes & Noble, Inc.,* 2020 WL 5350531 (S.D.N.Y. Sept. 3, 2020) ......................22

*Peffers v. Stop & Shop Supermarket Co. LLC*, 2015 WL 5460203 (S.D.N.Y. June 9, 2015)......21

*Penn Group, LLC v. Slater*, 2007 WL 2020099 (S.D.N.Y. Jun. 13, 2007) ................................16

*Peters v. Molley College of Rockville Centre*, 2008 WL 2704920 (E.D.N.Y. July 8, 2008) .......16

*Recant v. New York Presbyterian Hosp.*, 2009 WL 3490940 (N.Y. Sup. Ct. Oct. 15, 2009) ......16

*Roche v. Claverack Co-op. Ins. Co.*, 59 A.D.3d 914 (3d Dep't 2009).......................................21

*Scotto v. City of New York*, 2019 WL 6701919 (S.D.N.Y. Dec. 9, 2019)..................................17

*Stukuls v. State*, 42 N.Y.2d 272 (1977).....................................................................................17

*Thompson v. American Eagle Airlines, Inc.*, 2000 WL 1505972 (S.D.N.Y. Oct. 6, 2000)..........18

Plaintiffs Jamie Hodges and On The Move Ltd (collectively, "Plaintiffs"), by their undersigned counsel, respectfully submit this memorandum of law in opposition to the motion to dismiss filed by Defendants Keith L. Labis, Irish Dancing Teachers Association of North America-Mid-Atlantic Region, Inc. ("Mid-Atlantic"), and James Early's (collectively, the "Early Defendants").

## PRELIMINARY STATEMENT

The Early Defendants' motion to dismiss should be denied because it is patently premature in light of the Complaint's detailed allegations, and the fact-intensive nature of the defense that the Defendants are asserting.  In light of the Complaint's detailed allegations, the defenses raised by the Early Defendants plainly raise fact-intensive issues that should not be decided on this pre-answer motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

The Plaintiffs were wrongfully accused of sending an inappropriate video of a naked lady to two minor girls.  When the Plaintiffs heard of this accusation, and before the Early Defendants repeated this wrongful accusation, the Plaintiffs attempted to provide their version of events to the Early Defendants.  The Complaint spells out that the Early Defendants refused to hear the Plaintiffs' version of events, and instead lied to the Plaintiffs and told them that the investigation into this accusation had already been closed.  Then, in an outrageous act of character assassination, the Complaint details that the Early Defendants rushed to repeat this defamatory accusation to a meeting that was open to hundreds of participants, far beyond the leadership of Mid-Atlantic, and before the Defendants substantiated any the allegations (and indeed had refused to hear Plaintiffs' version of events).  The Early Defendants also led the hundreds of listeners to believe that law enforcement was actively investigating the Plaintiffs, when internal documents show that, in reality, law enforcement had already found no wrongdoing by the Plaintiffs.

Despite the detailed allegations of such outrageous defamation by the Defendants, the Early Defendants seek to have this case dismissed at the pre-answer motion to dismiss stage, by asserting a qualified "common interest" privilege – a defense which courts have cautioned is typically fact-

1

intensive and is usually not appropriately used to dismiss a pleading at the early motion to dismiss stage.  For the reasons set forth below, the Defendants' pre-answer motion should be denied.

First, the Early Defendants assert the fact-intensive, qualified common interest privilege. Courts have consistently held that the qualified "common interest" privilege is fact intensive, and that courts should be cautious of dismissing an action based on this defense on a pre-answer motion to dismiss. *See e.g.*, *ExpertConnect, LLC v. Fowler*, 2020 WL 3961004, at *3 (S.D.N.Y. Jul. 13, 2020) (holding that "[t]he Second Circuit has cautioned that the common interest privilege is better considered on a motion for summary judgment than a Rule 12 motion").

There are two well-recognized and independent exceptions to the qualified common interest privilege, one involving situations where the defamatory statement is excessively published, and the other where the speaker acts with malice.  If either of these exceptions are adequately pleaded, then this motion must be denied.  Here, the Complaint adequately alleges both of these independent exceptions to the qualified common interest privilege.

The first fact-intensive exception to a claim of qualified privilege is where the defendant "excessively publishes" the defamatory statements.   Here, the allegations of excessive publication are detailed, specifying outrageous character assassination by the Early Defendants that is clearly sufficient to survive this pre-answer motion.  The Complaint details that the Early Defendants excessively published their defamatory statements by announcing them in a meeting that was open to hundreds of participants, including numerous different dance organizations far beyond the leadership of Mid-Atlantic.  This case is the poster child for excessive publication – the Early Defendants, instead of tailoring their publication to a reasonable number of people to investigate the allegation made against the Plaintiffs, instead rushed to maliciously repeat the defamatory statements to hundreds of people outside of the Mid-Atlantic leadership.  The Complaint details that Mid-Atlantic engaged in this excessive publication, even after they had refused to hear the Plaintiffs' version of events, and indeed lied to the Plaintiffs and told them that their investigation had been closed, when in fact internal documents show the investigation was still open.  Although law enforcement found no wrongdoing whatsoever, the Early Defendants rushed to repeat the

defamatory statements to hundreds of participants, thus acting as judge, jury and executioner of Plaintiffs' reputations, in a *fait accompli* of character assassination which they now say is covered by a "privilege" as a matter of law on a motion to dismiss.

Not so fast.  If the common interest privilege is allowed to be used on these facts at the motion to dismiss stage, this means that wrongdoers can destroy people's reputations by spreading defamation to hundreds of people, but then argue that everyone in a wide community has a "common interest" in hearing the unsubstantiated allegation.  This is not the law.  And at this motion to dismiss stage, it is clearly premature for the Early Defendants to seek dismissal where such egregious facts of excessive publication are alleged.

The second exception to a claim of qualified common interest privilege is where it is alleged that the statements were made with malice.  Here, the Complaint sets forth detailed facts that explain how the Early Defendants' acted with malice.  Prior to the Early Defendants' repeating the defamatory assertions, the Plaintiff attempted to provide them with the Plaintiffs' version of events.  The Early Defendants lied and informed the Plaintiffs that their investigation of the incident was "closed."  Yet three days later, despite knowing that a law enforcement investigation concluded that Plaintiffs engaged in no wrongdoing, the Early Defendants still intentionally read the accusations out loud in a meeting that was open to hundreds of participants.  Indeed, the Early Defendants spread the defamatory statements to hundreds of people, even though internal minutes attached to the Complaint now show that the Defendants knew that law enforcement authorities had already found no wrongdoing by the Plaintiffs.  If these facts do not adequately plead malice, it would be difficult to imagine a scenario that would.  In short, the Early Defendants' assertion of qualified common interest privilege is not only the basis for a motion to dismiss, but they will not be able to prove this defense on the merits given that they have been caught in clear lies: lying to the Plaintiffs that the investigation had been closed, and then lying to hundreds of participants by stating that there was an active police investigation, when in fact authorities had already found no wrongdoing.

Second, the Defendant Labis argues that, in contrast to the other defendants, the Plaintiffs' defamation claim against him should be dismissed because the claim is based on an alleged omission, and that an omission is not actionable in the context of a defamation claim. However, Defendant Labis' argument is incorrect because the Plaintiffs are asserting a defamation by implication claim, which is clearly supported under New York law. New York law is clear that this type of defamation claim is sufficiently stated where affirmative statements, combined with facts known but intentionally omitted, falsely suggest or imply defamatory conduct to a plaintiff. Here, Plaintiffs are alleging that Defendant Labis defamed the Plaintiffs by falsely conveying that Plaintiffs were under active investigation by state and federal law enforcement authorities – when they already knew that the investigation was completed and had already found that Plaintiffs had not engaged in wrongdoing. These allegations are supported by internal Mid-Atlantic minutes, smoking gun evidence which is more than sufficient to allege a defamation claim against Defendant Labis for the purposes of a motion to dismiss.

Third, the Early Defendants argue for dismissal of Plaintiffs' tortious interference with prospective business relations claim because they claim it is duplicative of Plaintiffs' defamation claim, and that the Plaintiffs do not allege the elements of the claim. However, the Early Defendants are incorrect because, in support of the tortious interference claim, the Complaint alleges wrongful conduct that is separate from the verbal defamation of the Early Defendants, and thus the claim is not duplicative. Furthermore, Plaintiffs sufficiently allege each element of the claim.

For the reasons set forth more fully below, the Defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

This defamation and tortious interference action arises out of the malicious and intentional defamation of Plaintiffs Jamie Hodges ("Mr. Hodges") and On The Move Ltd (collectively, "Plaintiffs") by Defendants Molly Kathleen Lutwin ("Defendant Lutwin"), the Francis Academy

of Irish Dance (collectively, the "Lutwin Defendants"), James Early, Irish Dancing Teachers Association Of North America Mid-Atlantic Region, Inc. ("Mid-Atlantic") and Keith L. Labis (collectively, the "Early Defendants").

### A.  Summary of Complaint's Allegations Against the Early Defendants

The Plaintiffs' defamation and tortious inference claims against the Early Defendants arise from their shocking conduct during a meeting held on January 26, 2020, which was attended by hundreds of participants.  Specifically, on January 26, 2020, Defendants Mid-Atlantic, James Early and Keith Labis did the unthinkable:   during a meeting of Defendant Mid-Atlantic that was attended by hundreds of Irish Dance teachers throughout the Mid-Atlantic region (including teachers from New York, New Jersey, Pennsylvania and Delaware), Defendant Early (an officer of Defendant Mid-Atlantic and IDTANA), acting solely out of malice, read out loud to all the hundreds of attendees the false and unsubstantiated defamatory accusation that had been made by Defendant Lutwin: that Plaintiffs had sent an inappropriate video of a naked woman to two minors.[1]   Defendant Labis not only adopted the defamatory allegations, but equated them with child abuse and informed the hundreds of Irish Dance teachers in attendance that Plaintiffs were the subject of an investigation by government authorities (when in fact governmental authorities already concluded that there was no wrongdoing).  See Complaint at ¶ 7.

---

[1] Specifically, on November 24, 2019, Defendant Lutwin sent an email to multiple third parties associated with Defendant Mid-Atlantic (including Debbie Lynch-Webber, Colleen Carey, Karen A. Petri, Eileen Coyle-Henry and Amy Segal Loxley), falsely asserting that Plaintiff Hodges' company On The Move sent an inappropriate video featuring a naked woman to two girls under the age of 14.  Defendant Lutwin's November 24, 2019 email stated, in relevant part:

> There are two u14 girls in my school, Francis Academy of Irish Dance, who share and run an Instagram account for Irish Dancing. The girls were contacted by On the Move to promote their workshop and program by posting a video and pictures to the girls shared account. The girls agreed to upload the promotional video.  On the Move then sent them a video that was extremely inappropriate and disturbing.  The video is of a visibly naked woman running towards a camera and jumping on it…
> The girls did not know what to do.  They responded to On the Move that the video was inappropriate.  On the Move then apologized and told the girls that the account got hacked.

See Complaint at ¶ 40-41; Exhibit B.

### 1.  Defendant Early Places Himself in An Irreconcilable Conflict of Interest

Defendant Early placed himself in an irreconcilable conflict of interest by assuming the supposedly neutral roles of Regional Director of Mid-Atlantic, a board member of Irish Dance Teachers Association of North America ("IDTANA"),[2] and a board member of An Coimisiún Le Rincí Gaelacha ("CLRG")[3] – positions which include approving Irish Dance teachers and schools for summer camps and other Irish Dance events.   At the very same time that he took on these powerful positions, Defendant Early ran his own Irish Dance school, and served as an Irish Dance judge for compensation at Irish Dance schools with which he had a business relationship.   See Complaint at ¶ 27.

Defendant Early was therefore in a position, as Regional Director of Mid-Atlantic, a board member of CLRG, and a board member of IDTANA, to take negative actions against Irish Dance instructors, camps and schools that competed with his personal business interests.   See Complaint at ¶ 28.

### 2.  Defendants Early and Mid-Atlantic Acknowledged Plaintiffs' Strong Reputation and Qualifications to Teach Irish Dance By Approving Plaintiffs To Participate in An Irish Dance Summer Camp

In November 2019, Mr. Hodges contacted Defendant Early, the Regional Director for Mid-Atlantic, to apply for approval from Mid-Atlantic to conduct an Irish Dance summer camp. Defendant Early repeatedly informed Mr. Hodges that his application was approved. See Complaint at ¶ 31 and 32.

For example, on November 18, 2019, Mr. Early emailed Mr. Hodges and confirmed the approval to Mr. Hodges.   Specifically, Defendant Early stated the following to Mr. Hodges in his November 18, 2019 email: "The Mid-Atlantic Region of IDTANA Inc have no problem with your

---

[2] IDTANA is the official body that offers Irish Dance instructors in the United States certification to teach Irish Dance.  Defendant Mid-Atlantic is one of seven regions within North America that are a part of IDTANA.  See Complaint at ¶ 15.

[3] CLRG is located in Ireland, and is the worldwide governing body for competitive Irish Dance.  Defendant Early also serves as a board member of, and is head of the Rules Committee of CLRG.  See Complaint at ¶ 14.

Dance Camp; On the Move being run within the MAR [Mid-Atlantic Region] next July provided that all rules and regulations of CLRG pertaining to such Open Dance Camps are followed and adhered to."  See Complaint at ¶ 33; Exhibit A. Defendant Early's written confirmation that Plaintiffs had been approved for their Irish Dance summer camp demonstrates that, as of November 18, 2019, Defendants Early and Mid-Atlantic were forced to recognize Plaintiffs' good reputation and qualifications to teach Irish Dance.  See Complaint at ¶ 34.

However, the Irish Dance schools that Plaintiffs were going to participate in with a summer camp program were Irish Dance schools that compete with Defendant Early's Irish Dance school. Moreover, Defendant Early had a business interest with a competing Irish Dance summer camp. Specifically, Defendant Early was paid by Camp Rince Ceol to act as a judge for its Irish Dance Camp.  See Complaint at ¶ 35.  After Plaintiffs received approval from Defendants Early and Mid-Atlantic to conduct an Irish Dance Camp, Plaintiffs proceeded to sign up dozens of students for the summer camp.  See Complaint at ¶ 36.

### 3. IDTANA Questions Plaintiffs Regarding the Baseless Allegations Made By Defendant Lutwin

On January 22, 2020, Mr. Hodges discovered more details about the November 24, 2019 defamation by Defendant Lutwin, this time from Judy McCafferty, who at the time was a member and board member of both CLRG and IDTANA (Mid-Atlantic is one of the regions within IDTANA).  Ms. McCafferty's email stated that she was assigned to investigate allegations regarding two young girls from the Francis Academy receiving an unidentified "video."  In connection with her investigation, Ms. McCafferty's January 22, 2020 email to Mr. Hodges requested the personal email address of Mitchell Hodges, Mr. Hodges' brother and business partner at On The Move.  See Complaint at ¶ 79.

Specifically, the January 22, 2020 email from Judy McCafferty stated the following:

I need a personal email address for Mitchell Hodges. I am a member of Coiste Faire and have been assigned to look into the video that was received by 2 young girls from the Francis Academy of Irish Dance. Thank you.

See Exhibit F to the Complaint.

Because the allegation regarding the video was false, Mr. Hodges immediately responded to Ms. McCafferty's email, and requested to know who had made the false allegations.  See Complaint at ¶ 81; Exhibit G.  In response, the very next day, on January 23, 2020, Ms. McCafferty responded, and stated to Mr. Hodges that, "upon further review, the matter was closed."  See Complaint at ¶ 82; Exhibit H.  This naturally led Plaintiffs to conclude that the investigation uncovered no substantiation for the allegations made against them, and that the investigation was, indeed, "closed" by CLRG, IDTANA and its regions, including Mid-Atlantic.

### 4.   On January 26, 2020, Defendant James Early Maliciously and Intentionally Repeats The Defamatory Assertions To Hundreds of Teachers in the Irish Dance Community

Three days after Ms. McCafferty (who was then a board member of IDTANA and CLRG) informed Plaintiff Hodges that the investigation had been closed, and without any further notice to the Plaintiffs, on January 26, 2020, Defendants Mid-Atlantic and James Early did the unthinkable:  during the January 26, 2020 meeting of Defendant Mid-Atlantic that was attended by hundreds of Irish Dance teachers throughout the Mid-Atlantic region (including teachers from New York, New Jersey, Delaware, and Pennsylvania), Defendant Early read out loud to all the hundreds of attendees at the meeting the false and defamatory accusation that had been made by Defendant Molly Kathleen Lutwin and the Francis Academy, namely, that the Plaintiffs sent an inappropriate video to young girls.  See Complaint at ¶ 83.

The January 26, 2020 meeting was held at Marriot Hotel in Saddle Brook, New Jersey, with dozens of attendees also participating via telephone.  See Complaint at ¶ 85.  Included among those attendees of the meeting were dozens of colleagues of Plaintiff Hodges, who had worked with Mr. Hodges during his many successful Irish Dance performances and teaching career.  In addition, Mr. Hodges was known by nearly every attendee of the January 26, 2020 meeting by virtue of Mr. Hodges attending various events at many of their dance schools.  See Complaint at ¶ 86.  As an Irish Dance instructor, Mr. Hodges' livelihood and reputation depended on these

individuals working with him in the future.  Defendants knew of Mr. Hodges' essential connections to the dozens of attendees at the January 26, 2020 meeting.  See Complaint at ¶ 87.

During the January 26, 2020 meeting, Defendant Early shockingly ***read out loud*** Defendant Lutwin's defamatory accusations regarding the Plaintiffs as purported statements of fact, to the hundreds of participants attending the meeting.   This was particularly malicious and outrageous, because Early read the Lutwin accusations out loud to hundreds of people despite the fact that he was fully aware of the fact that three days earlier, on January 23, 2020, Mr. Hodges was advised by Ms. McCafferty that the investigation regarding this matter was "closed," and refused to accept Plaintiffs' version of events.  See Complaint at ¶ 88.

Indeed, because the investigation was "closed," Mid-Atlantic and IDTANA never gave Plaintiff Hodges the opportunity he requested to fully understand what allegations were being made and an opportunity to provide his side of the story.  The reason that Early and Mid-Atlantic did not want Plaintiff Hodges' side of the story was because they were not interested in the truth, facts, evidence or fairness: rather, they were plainly motivated solely by malice to destroy the reputations of the Plaintiffs.  Defendant Early's malicious repetition of the defamatory Lutwin allegations to hundreds of people was captured on an audio recording.  See Complaint at ¶ 89 and 90; Exhibit I.

As the audio recording proves, at the January 26, 2020 meeting of Mid-Atlantic, Defendant Early maliciously repeated as a purported statement of fact, that Plaintiff Hodges and his dance company On The Move sent a sexually explicit video to girls of the Francis Academy Irish Dance school.  Specifically, Defendant Early read out loud the following to hundreds of participants at the meeting:

> The girls were contacted by On the Move to promote their workshop and program by posting a video and pictures to the girls' shared account. The girls agreed to upload the promotional video. **On the Move then sent them a video that was extremely inappropriate and disturbing.  The video is of a visibly naked woman running towards a camera and jumping on it. The camera then reveals a cartoon or CGI baby within the private parts of the the woman.** It is shocking and difficult to describe… I would like to lodge a formal complaint to CLRG

9

against Jamie and Mitch Hodges and On the Move.  I would appreciate the board letting me what can be done to protect our dancers and attendees next weekend. Thank you, Molly Lutwin.

See Complaint at ¶ 91;  Exhibit I.

The January 26, 2020 meeting was attended by Defendant Keith Labis, who was acting as the attorney for Defendant Mid-Atlantic.  During the meeting, Defendant Labis further defamed the Plaintiffs.

Specifically, Mr. Labis stated the following at the January 26, 2020 meeting:

**What I want to say is that because of everything going on and because I have contact with this federal agency I went back to them immediately.  The next day they were involved.**  Its nice to report it to the Board and CLRG and that but really when **you suspect abuse**, like I said, you all remember I came here and talked about going for the gold with gymnastics cause my niece was involved and before any of this happened. . . **So we made the recording to a federal police agent and then it followed it through to the New York State police**.

See Exhibit I to the Complaint.

Again, there is an audio recording of what Mr. Labis stated, so Mr. Labis – an attorney and officer of the court – will not be able to deny what he stated, and what he intentionally omitted to state.  See Complaint at ¶ 97.

Defendant Labis' affirmative statements, combined with facts he knew but intentionally omitted, falsely conveys as purported fact that Mr. Hodges was as of January 26, 2020, actively being investigated by state and federal law enforcement authorities.  However, this purported assertion of fact and innuendo was false.  As Mid-Atlantic latter admitted, prior to the January 26, 2020 Mid-Atlantic meeting, Defendants Early and Labis knew that New York State authorities confirmed they had looked into the matter and they believed a crime had ***not*** been committed.  See Complaint at ¶ 98.

Defendant Labis' purported assertion of fact that, as of January 26, 2020, an active investigation by government authorities was in process, is also defamatory.  Defendant Labis' statement clearly conveys to the reader that Plaintiffs are being investigated for serious wrongdoing that warranted a police investigation, and Labis went out of his way to analogize

Plaintiffs' conduct to criminal instances of child abuse.  This clearly subjects Plaintiffs to public contempt, hatred, ridicule, aversion, or disgrace.  Indeed, since Plaintiff Hodges and his dance company On The Move teach Irish Dance to young children, the statement of purported fact that Mr. Hodges was being investigated by state and federal law enforcement authorities clearly subjects Plaintiffs to public contempt, hatred, ridicule, aversion, or disgrace, and completely destroys Mr. Hodges and his dance company's reputations.  See Complaint at ¶ 99.

In addition, Labis' false assertion that Plaintiffs were being investigated by government authorities also constitutes defamation *per se*, as it is of the type of statement that tends to injure Plaintiffs in their trade, business, and profession and impute salacious and immoral conduct to the Plaintiffs.   It is obvious that telling hundreds of people within the Irish Dance community the statement of purported fact that Plaintiffs were being investigated by state and federal law enforcement authorities for acts that are similar to child abuse would injure the Plaintiffs' trade, business and profession.  See Complaint at ¶ 100.

## 5. Detailed Allegations of Early's and Labis' Malice, and Their Clearly Excessive Publication of the Defamatory Statements

Defendant Early's repetition of Lutwin's defamatory allegations, and Labis' defamatory statements, were made solely out of malice, and with actual knowledge of that the defamatory assertions were false.  Early's and Labis' malice is especially clear given their intentional omission of several critical facts to the hundreds of attendees at the January 26, 2020 meeting, which facts Early and Labis were fully aware of before that meeting: (a) that they did not have any have first-hand knowledge of the allegations being made; (b) that Ms. McCafferty had clearly informed Plaintiff that the investigation was "closed" a few days prior to the January 26, 2020 meeting; (c) that Plaintiff Hodges asked on January 23, 2020 to understand what was being alleged and to have an opportunity to respond, but Early, Labis, IDTANA and Mid-Atlantic had intentionally refused to hear Hodges' side of the story, or provide Mr. Hodges with any opportunity to defend himself against the allegations whatsoever; (d) that Mr. Hodges had denied the allegations, and (e) Early, Labis and Mid-Atlantic had actual knowledge that authorities had already been notified, and such

11

authorities had already concluded that there had been no finding of wrongdoing by the Plaintiffs. See Complaint at ¶ 102.

Defendants Early, Labis and Mid-Atlantic intentionally and maliciously omitted all of these critical facts, at the very same time that they repeated the wild, defamatory accusations made by Lutwin to hundreds of people within the Irish Dance community.   The reason that Defendants Early, Labis and Mid-Atlantic omitted these key facts was because their purpose was not to actually find out what had occurred or to "protect children."  Rather, acting solely out of malice, Defendants Early, Labis and Mid-Atlantic simply wished to destroy the Plaintiffs' reputation.  Had Defendants Early, Labis and Mid-Atlantic truly intended to protect children, there were obviously numerous ways that they could have and should have taken steps to have the matter investigated, without utterly destroying the Plaintiffs reputation by needlessly repeating the false and unsubstantiated allegations regarding the Plaintiffs to literally hundreds of attendees at the meeting.   See Complaint at ¶ 103.

Moreover, what is particularly outrageous is that prior to the January 26, 2020 meeting, Early, Labis and Mid-Atlantioc knew that, in fact, an investigation had already taken place by authorities, who had already determined that no wrongdoing had taken place by the Plaintiffs. Thus, Defendant Early's reading out the unsubstantiated allegations to hundreds of people, and Labis' defamatory statements to the hundreds of attendees, was clearly motivated solely by malice, and clearly constituted excessive publication.  See Complaint at ¶ 106.

### 6.  The Plaintiffs Are Informed that Approval for Their Camp is Withdrawn, and They Would No Longer Be Able Work in Irish Dance

The very next day after the January 26, 2020 meeting, Defendant Early notified the Plaintiffs that their approval for the application for Irish Dance camp was rescinded. Specifically, on January 27, 2020, Defendant Early notified On the Move via email of the following:

> The application was received and was brought to the Rules Committee (Coiste Rialacha) for discussion and review… Additionally, **a formal complaint was filed with the region and brought to the meeting and read**. Following a discussion, the whole matter was sent to the Coiste Faire (Ethics Committee) for a further

> review and investigation. The timing on the turnaround is unknown. It should also be noted that based upon the letter of complaint from a teacher in Syracuse, the recommendation letter from the Mid-Atlantic Region has been rescinded pending a result from the Coiste Faire investigation. If I hear anything further, I will contact you.

See Complaint at ¶ 107-108.

The determination by Early and Mid-Atlantic to rescind the approval was wrongful, and, on top of the defamation that had occurred, constituted tortious interference with contract and prospective business relations.  Based on the prior approval for its camp that Early had provided on November 18, 2019, at least 54 children had already signed up for On the Move's summer camp by November 24, 2019.  Just based on these children, Plaintiffs would have made approximately $53,946 in tuition fees.  Moreover, given the speed with which children were quickly signing up for its camp, if Early had not tortiously interfered as he did, Plaintiff On the Move was clearly on a course to sell out the camp, and, but for Early's and Mid-Atlantic's tortious inference, Plaintiffs would have been able conduct the camp (including via remote video as many Irish Dance schools did in 2020 due the COVID-19), and would have earned approximately $249,750 in 2020 just for its work with the camp.  See Complaint at ¶ 109.

As a direct and proximate result of Defendants' defamation, CLRG – the worldwide body that governs Irish Dance – determined to disqualify the Plaintiffs from being able to teach Irish Dance at all.  In a January 29, 2020 letter from Judy McCafferty on behalf of CLRG, Ms. McCafferty updated Defendant Lutwin on the false and defamatory complaint that Lutwin had launched against the Plaintiffs.  See Complaint at ¶ 111; Exhibit J.  As explained by Ms. McCafferty, CLRG had determined that the Plaintiffs' Irish Camp would not be approved.

Ms. McCafferty's January 29, 2020 letter also contains a shocking assertion that completely contradicts what Ms. McCafferty had informed Plaintiff Hodges on January 23, 2020. Specifically, Ms. McCafferty's January 29, 2020 letter states that the investigation into Lutwin's complaint about the Plaintiffs was "formally closed as of January 29, 2020." See Exhibit J.  This assertion completely contradicts what Ms. McCafferty informed Plaintiff Hodges on January 23,

2020.  As set forth above, on January 23, 2020, Ms. McCafferty informed Plaintiff Hodges (in response to his request to understand the allegations made against him, and to be able to respond), that the investigation was "closed" as of that date, i.e., January 23, 2020.  See Complaint at ¶ 113; Exhibit J.

### 7. The Blatant and Obvious Cover-Up Of What Really Transpired At The January 26, 2020 Meeting

Adding insult to injury, Defendants Mid-Atlantic, Early and Labis then engaged in a blatant cover up attempt.  In a failed effort to cover up the undeniable fact that the defamatory statements were uttered to hundreds of people, Defendants Mid-Atlantic, Early and Labis decided to engage in fraud and created fake records of what actually transpired during the January 26, 2020 meeting. After receiving the Plaintiffs' February 3, 2020 letter, these defendants created fraudulent minutes of the January 26, 2020 meeting.  See Complaint at ¶ 120.

Specifically, these defendants created minutes of the January 26, 2020 Mid-Atlantic meeting, which minutes are dated February 11, 2020.  These "minutes" blatantly recite a false account and summary about what was actually stated by Defendants Early and Labis at the January 26, 2020 meeting.  These falsified minutes falsely indicate that during the January 26, 2020 Mid-Atlantic meeting, the following was stated: "New York authorities looked into the matter and believed that a crime had not been committed."  See Complaint at ¶ 121; Exhibit L.

However, as the audio recording of the January 26, 2020 meeting demonstrates, the Defendants Early, Labis and Mid-Atlantic in fact deliberately omitted this important exonerating information.  See Complaint at ¶ 122.

### 8. Defendants Lutwin and Early Quickly Gain from The Unfair Destruction of Plaintiffs

The unfair destruction of Plaintiffs' reputation, and the resulting unfair termination of its summer camp, clearly benefitted a competing Irish Dance summer camp in which Defendant Mr. Early has an economic interest.  Less than two weeks after Defendant Early destroyed the Plaintiffs' reputation in front of hundreds of third parties in the Irish Dance community at the January 26, 2020 meeting, on February 10, 2020, an Irish Dance summer camp named "Camp

Rince Ceol" began to send emails soliciting customers with an emphasis on a purported "child safety policy."  Thus, Camp Rince Ceol was clearly seizing on the character assassination and destruction of Plaintiffs.  See Complaint at ¶ 125-126.

Defendant Early works for compensation at Camp Rince Ceol as a grade "examiner." Thus, less than two weeks after the Plaintiffs' reputations and careers were unfairly destroyed by the defamatory allegations that Defendant Early read out loud to hundreds of third parties, Camp Rince Ceol opportunistically touted its "child protection policy" and thus lured in many Irish Dance students who otherwise would have attended the Plaintiffs' Irish Dance camp.  See Complaint at ¶ 128-129.

In light of the Complaint's detailed well-pleaded allegations, the Early Defendants' motion to dismiss should be denied.

## ARGUMENT

**I.    THE COMPLAINT ADEQUATELY ALLEGES EXCEPTIONS TO THE EARLY DEFENDANTS' "COMMON INTEREST DEFENSE" – A DEFENSE WHICH  RAISES FACT ISSUES THAT CANNOT BE RESOLVED ON THIS MOTION TO DISMISS GIVEN THE COMPLAINT'S WELL-PLED ALLEGATIONS**

It is undisputed for purposes of this motion to dismiss that the Early Defendants made the defamatory assertions at issue: they read out loud to hundreds of people the accusation that the Plaintiffs sent an inappropriate video to two minor girls.  Yet the Early Defendants seek pre-answer dismissal of the action by asserting that their defamatory assertions made against the Plaintiffs are protected by the fact-intensive "common interest" privilege defense.  Doc. 31, Def. Br. at 15-17.

However, given the well-plead allegations of the Complaint, including the two well-recognized exceptions to the common interest privilege, it is premature for the Early Defendants to raise the common interest privilege on these alleged facts.

The common interest privilege only affords a qualified privilege and defense to a defamation claim, but there are two well-established and independent exceptions to this privilege. These two independent exceptions involve situations when there has been excessive publication of the defamatory statements, or where the defamatory statements were made with malice.  Where

either of these two, independent exceptions are adequately alleged, then a motion to dismiss must be denied.   Here, the Complaint adequately alleges both exceptions.   Thus, based on the Complaint's well-plead allegations, the Early Defendants' motion to dismiss based on the common interest defense should be denied.

### A. Courts Have Cautioned Against Dismissing Complaints Based On The Common Interest Privilege At The Pre-Answer Motion To Dismiss Stage

Courts have repeatedly held that they should exercise caution before using the common interest privilege to dismiss a defamation claim on a pre-answer motion to dismiss.   *See e.g.*, *ExpertConnect, LLC v. Fowler*, 2020 WL 3961004, at *3 (S.D.N.Y. Jul. 13, 2020) (holding that "[t]he Second Circuit has cautioned that the common interest privilege is better considered on a motion for summary judgment than a Rule 12 motion"); *Conti v. Doe*, 2019 WL 952281, at *9 (S.D.N.Y. Feb. 27, 2019) (holding that "the Second Circuit has cautioned district courts against dismissing defamation claims based on the common interest privilege when deciding a Rule 12(b)(6) motion, holding that the privilege is better considered on a motion for summary judgment").[4]

It is true that if a complaint consists of only bare and conclusory allegations of excessive publication and malice, then some courts have held that the common interest privilege can be used successfully on a motion to dismiss.   However, in this case, the Complaint sets forth very specific

---

[4] Some courts have gone so far as to hold that because the common interest privilege is an affirmative defense, it flatly cannot be used as a basis for dismissal at the pre-answer motion stage.   *Menaker v. C.D.*, 2018 WL 5776533, at *6 (E.D.N.Y. Nov. 1, 2018) *quoting Peters v. Molley College of Rockville Centre*, 2008 WL 2704920, at *9 (E.D.N.Y. July 8, 2008) (denying motion to dismiss "[b]ecause the common interest privilege constitutes an affirmative defense ... it does not lend itself to a preanswer motion to dismiss..."); *Penn Group, LLC v. Slater*, 2007 WL 2020099, at *6 (S.D.N.Y. Jun. 13, 2007) (denying motion to dismiss where defendant raised common interest privilege because "these factual questions depend upon the assessment of an evidentiary record, which is not available to us on a Rule 12(b)(6) motion").   *See also e.g., Recant v. New York Presbyterian Hosp.*, 2009 WL 3490940, at *4 (N.Y. Sup. Ct. Oct. 15, 2009) ("This issue cannot be determined on a motion to dismiss.   This court is bound to follow the First Department decision in *Garcia v. Puccio*, 17 AD3d 199, 201 (1st Dep't 2005), which holds that a claim of qualified privilege is an affirmative defense, to be raised in defendant's answer, and then in a summary judgment motion.").   However, some federal decisions have held that if the exceptions to the common interest privilege are purely conclusory, dismissal pursuant to Rule 12(b)(6) may be granted.   See Def. Br. at 10-11.   Here, the Complaint alleges excessive publication and malice with great specificity and factual support, and thus dismissal based on the common interest defense is clearly not warranted.

facts and details supporting that there was excessive publication and malice.  Thus, in light of the Complaint's well-pleaded allegations, the Early Defendants cannot use the common the interest privilege at this pre-answer stage to dismiss the Complaint in this action.

**B.  The Complaint More Than Adequately Alleges That The Early Defendants "Excessively Published" Their Defamatory Statements**

The first exception to a claim of common interest privilege is where the defendant "excessively publishes" the defamatory statements.  The Early Defendants strangely argue that the excessive publication exception is not well-established in New York law, and even frivolously assert that the exception has only been articulated in "dicta."  Def. Br. at 21.  The Defendants' argument that the excessive publication exception is not well-established and has only been made in "dicta" is baseless – to the point of being frivolous.

It is well-established under New York law that excessive publication is an exception to the common interest privilege, and that excessive publication results in a defendant not being able to rely on the qualified "common interest" defense.  *See e.g.*, *Scotto v. City of New York*, 2019 WL 6701919, at *10 (S.D.N.Y. Dec. 9, 2019), *quoting Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000) (holding that "[i]f a defamatory communication is conditionally privileged, the plaintiff may nonetheless prevail by establishing that it was published excessively"); *Stukuls v. State*, 42 N.Y.2d 272, 281 (1977) (reversing the granting of a motion to dismiss where an unsubstantiated defamatory letter was read to numerous individuals, holding that "the protection of the [common interest] privilege will still be subject to defeasance by **excessive publication**").

Both Federal and New York State courts have also held that whether a defamatory statement has been excessively published is a fact-intensive inquiry that depends on the manner in which the defamatory statement was published, including the number of people the statement was repeated to, and the context in which the defamatory statement was made.  *See e.g.*, *James v. DeGrandis*, 138 F.Supp.2d 402, 417 (W.D.N.Y. 2001) (denying summary judgment as to the common interest privilege because of the "widespread publishing" of a defamatory letter to the Niagara University community regarding a soccer coach); *Thompson v. American Eagle Airlines,*

*Inc.*, 2000 WL 1505972, at *7 (S.D.N.Y. Oct. 6, 2000) (denying summary judgment as to the common interest privilege because "statements were published to American Airlines employees who were not co-employees of Wheatley.  The issue of whether Wheatley and the American Airlines security guards share a sufficient interest in the subject of the statement for the qualified privilege to attach is an issue of fact that cannot be resolved on this motion for summary judgment"); *Stukuls v. State*, 42 N.Y.2d 272, 281 (1977) (reversing a motion to dismiss based on the common interest privilege; contrasting how "[t]he letter reading did not take place before a large or disinterested audience, but at a meeting of the small, and perhaps sophisticated, committee of five people" might support a conclusion that the statement was not excessively published, but contrasting that with other facts indicating that the reading may still have been excessively published).

The decision by the New York Court of Appeals in *Stukuls v. State*, 42 N.Y.2d 272 (1977) is instructive.  In *Stukuls*, the Court of Appeals stressed the factual nature of whether excessive publication defeats a common interest privilege defense to defamation.  For example, the *Stukuls* Court stressed that in determining whether a defamatory statement was excessively published, a relevant factor can be if the defamer had a contrary obligation to not publish the statement, if it was known to have been discredited.  *Id*. at 282 ("[i]f, for instance, it was rumor, or known to him or other college authorities to be false or to be no more than a republication of a rumor which previously had been discredited, he may not have had any obligation to communicate; rather, under such circumstances, he may have been under a contrary obligation, that is, not to use such misleading, unreliable or defamatory matter").  This is the exact scenario that is present in this case.

Here, the Complaint clearly alleges that "Defendant Early's reading out the unsubstantiated allegations to hundreds of people, and Labis' defamatory statements to the hundreds of attendees … clearly constituted excessive publication excessive publication."  See Complaint at ¶ 106.  In support of the Plaintiffs' claim that the Early Defendants' excessively published their defamatory statements, the Complaint details that the Early Defendants excessively published their defamatory

statements by announcing them in a meeting that was open to hundreds of participants, including numerous different dance organizations far beyond the leadership of Mid-Atlantic.  Complaint at ¶ 88; 102.  Importantly, the Early Defendants, instead of tailoring their publication to a reasonable number of people to investigate the allegation made against the Plaintiffs, instead rushed to maliciously repeat the defamatory statements to hundreds of people outside of the Mid-Atlantic leadership.  The Complaint details that Mid-Atlantic engaged in this excessive publication, even after they had refused to hear the Plaintiffs' version of events, and indeed *lied* to the Plaintiffs and told them that the investigation had been closed, when in fact internal documents show that their investigation was still open.   Moreover, although law enforcement found no wrongdoing by the Plaintiffs whatsoever prior to the meeting, the Early Defendants rushed to repeat the defamatory statements to hundreds of people.  Complaint at ¶ 103-106; 120-129.

The Early Defendants contend that, as a matter of law on a motion to dismiss, because the hundreds of participants at the meeting were members of a multi-state umbrella association of independent Irish Dance schools, which include numerous different and independent dance organizations, every single member of Mid-Atlantic "shared a common interest" – as a matter of law, on a motion to dismiss.  However, as shown above, this is not the law.  If the Early Defendants were correct, then any person who is part of an umbrella association containing hundreds of independent entities (such as a bar association) would be able to defame someone who is a member of that association and then simply invoke the "common interest" privilege as an impenetrable shield – on a motion to dismiss.

As an example, suppose an attorney who is a member of the New York State Bar Association, consisting of hundreds or thousands of independent lawyers and law firms, defames another member attorney at an annual bar association meeting, by announcing defamatory statements to thousands of other members in attendance.  Imagine the lawyer being accused of stealing client funds, and the accuser asserting that all the lawyers in the community have a "common interest" in avoiding working with the accused attorney.  The attorney who defamed and destroyed the reputation of the other attorney could, under Defendants' extreme theory, then

invoke the common interest privilege and be exonerated as a matter of law – all at the motion to dismiss stage, without the benefit of any discovery.  This is not the law.  Indeed, the Defendants' theory would allow individuals to defame others before thousands of listeners, with impunity – as a matter of law, with the victims having no day in court, no discovery, and no chance to seek redress for utterly destroyed reputations.

The Defendants also argue that the number of people that a party publishes the statements to is irrelevant as a matter of law.  Def. Br. at 21.  This completely defies the law and common sense.  As squarely held by the Court of Appeals in *Stukuls*, it is obvious that number of people the statement is published to is a relevant factor when considering whether a statement was excessively published.  See *Stukuls v. State*, 42 N.Y.2d 272, 281 (1977) (reversing a motion to dismiss based on the common interest privilege; contrasting how "[t]he letter reading did not take place before a large or disinterested audience, but at a meeting of the small, and perhaps sophisticated, committee of five people" might support a conclusion that the statement was not excessively published, but contrasting that with other facts indicating that the reading may still have been excessively published).

Thus, the fact that Defendants read the defamatory statements to the hundreds of attendees at the meeting is certainly relevant as part of the fact-intensive question of whether the Defendants excessively published the defamatory accusation made about the Plaintiffs, and defeats any qualified privilege argument at this early pre-answer motion to dismiss stage.

**C.  The Complaint More Than Adequately Alleges Malice**

The Early Defendants argue that Plaintiffs do not adequately allege that the Defendants statements were made with actual malice, which is the second fact-intensive exception to the common interest privilege.  See Def. Br. at 17-20.  However, this argument utterly fails because Plaintiffs have alleged in great detail that the Early Defendants' defamatory statements – read out loud to hundreds of people – were undeniably made with malice and reckless disregard for the truth of the statements.

It is well-settled that a defamation claim adequately alleges malice where, as here, facts are plausibly alleged to show that a defamatory statement was made out of spite, intentionally or with reckless disregard for its truth. *See e.g.*, *Peffers v. Stop & Shop Supermarket Co. LLC*, 2015 WL 5460203, at *8 (S.D.N.Y. June 9, 2015) (defeating the common interest privilege on a motion to dismiss because the allegations a defendant "fabricate[d] an encounter with plaintiff to provide Stop & Shop with a basis for firing him" was sufficient to plead actual malice); *Scotto v. City of New York*, 2019 WL 6701919, at *11 (S.D.N.Y. Dec. 9, 2019) (denying motion to dismiss based on the common interest privilege because  an "issue of fact remains as to whether Defendant Caraway acted with malice or reckless disregard for the truth"); *Roche v. Claverack Co-op. Ins. Co.*, 59 A.D.3d 914, 916 (3d Dep't 2009) (defeating the common interest privilege on a motion to dismiss because "Plaintiff contends that defendants intentionally fabricated the memoranda to contain numerous false statements").

The Complaint sets forth with great detail that the Early Defendants' statements were undoubtedly malicious because the Early Defendants read their statements out loud to hundreds of people ***despite knowing*** that three days prior to their announcement, the Early Defendants' colleague, Judy McCafferty, abruptly advised Plaintiff Hodges that the investigation regarding the allegations of wrongdoing had been "closed" (oddly, one day after she had just inquired of the Plaintiffs for contact information regarding the false allegations), leading Plaintiffs to naturally believe that the investigation found no wrongdoing.  Complaint at ¶ 88.  The Complaint spells out that the Early Defendants never asked Plaintiffs for their side of the story, and indeed rebuffed the Plaintiffs' attempts to tell their side of the story.  Complaint at ¶ 102.  The Complaint also points to internal documents showing that while the Plaintiffs were abruptly told that the investigation was already closed (to block their version of events), in fact the Mid-Atlantic investigation was still open.  These are all details that clearly support an allegation of malice.  The only logical reason that the Early Defendants never permitted the Plaintiffs to understand the accusations or provide their side of the story was because the Defendants were plainly motivated to completely destroy the reputations of the Plaintiffs, despite their knowing that the accusations had not been

substantiated, and that an investigation by authorities had concluded that the Plaintiffs engaged in no wrongdoing.  Complaint at ¶ 89; 102-106.  If these types of lies, deceit and arbitrary destruction by accusation do not support a contention of malice, it is hard to imagine what would.

The Complaint also alleges that Defendant Early had a motive to defame the Plaintiffs, because he was a competitor of the Plaintiffs and received income from a rival summer camp. Complaint at ¶ 125-126.  In arguing for dismissal, the Defendants glaringly omit these detailed allegations, and instead assert that they are "conclusory."  Def. Br. at 18.  As shown above, that is clearly not the case: rather, there are ample facts alleged to support that the Early Defendants acted with malice.  If these allegations are not sufficient to plead malice, it would be difficult to imagine a scenario that would.  The Complaint's detailed allegations of malice clearly defeat this motion to dismiss.

## II.    PLAINTIFFS' DEFAMATION CLAIM AGAINST DEFENDANT LABIS IS SUFFICIENTLY ALLEGED

Defendants next assert that Plaintiffs' defamation claim against Defendant Labis should be dismissed because the claim is based on an alleged omission, and that an omission cannot support a defamation claim.  See Def. Br. at 22-23.  However, Defendants' argument is incorrect because the Plaintiffs are asserting a defamation by implication claim, which is clearly supported under New York law.

The case law is clear that a viable defamation claim is stated where, as here, a defendant's affirmative statements, combined with facts known but intentionally omitted, falsely suggest or imply defamatory conduct to a plaintiff.  *See e.g., Parneros v. Barnes & Noble, Inc.,* 2020 WL 5350531, at *6 (S.D.N.Y. Sept. 3, 2020) *citing Macineirghe v. County of Suffolk*, 2015 WL 4459456, at *10 (E.D.N.Y. July 21, 2015) (holding that "defamation by implication can include statements whose falsity is based not on what was said, but rather '**by omitting** or strategically juxtaposing key facts'"); *Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F.Supp.3d 240, 253 (S.D.N.Y. 2014), *quoting Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380–81(1995) (holding that

"[d]efamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements").

Here, the Complaint clearly alleges a sufficient defamation claim against Defendant Labis. The Complaint alleges that Labis' affirmative statements and intentional omissions falsely conveyed, as purported fact, that Mr. Hodges was, as of January 26, 2020, actively being investigated by state and federal law enforcement authorities. Complaint at ¶ 98-101. The Complaint spells out that Defendant Labis made this statement despite already knowing that the investigation was completed and had already found that Plaintiffs had not engaged in wrongdoing. Complaint at ¶ 106. These allegations are supported by internal Mid-Atlantic minutes which admit that authorities found no wrongdoing by Plaintiffs -- smoking gun evidence which is more than sufficient to allege a defamation claim. Complaint at ¶ 120-129. Thus, the Complaint's detailed sufficiently allege a defamation claim against Defendant Labis and defeat this motion to dismiss.

### III. PLAINTIFFS' TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS CLAIM IS SUFFICIENTLY ALLEGED

Defendants argue for dismissal of Plaintiffs' tortious interference with prospective business relations claim because they claim it is duplicative of Plaintiffs' defamation claim and that the Plaintiffs do not allege the elements of the claim. Def. Br. at 23-24. However, Defendants are incorrect because, in support of the tortious interference claim, the Complaint alleges wrongful conduct that is separate from the verbal defamation of the Early Defendants, and thus the claim is not duplicative. Furthermore, Plaintiffs sufficiently allege each element of the claim.

It is well-settled that where, as here, a plaintiff alleges conduct that is an independent wrongful act separate from the verbal defamation claim, these allegations are sufficient to defeat a motion to dismiss. That is, if it is alleged that the damages from the tortious interference with prospective business relations claim arose from conduct separate from the defamation, the claims are not duplicative. *See e.g., Cojocaru v. City University of New York*, 2020 WL 5768723, at *7 (S.D.N.Y. Sept. 28, 2020) (denying motion to dismiss tortious interference with prospective business relations claim as duplicative of defamation claim because the claim is only to be

dismissed where "where all of the alleged injuries in relation to the tortious interference claim arise from the allegedly defamatory statements"). *See also Bertuglia v. City of New York,* 839 F.Supp.2d 703, 729 (S.D.N.Y. 2012) (holding that allegations that defamatory statements were made "with the express purpose of interfering with plaintiffs' business relationships with … third parties" sufficiently stated a tortious interference with prospective business relations claim).

The Complaint alleges wrongful non-verbal conduct that is separate from the Early Defendants' defamation and supports an independent tortious interference claim. Specifically, the Complaint alleges that Early Defendants **withdrawal of the approval for Plaintiffs' camp** made it impossible for parents or students to participate in an Irish Dance camp with the Plaintiffs. Complaint at ¶ 167. Thus, apart from the defamatory words spoken by the Early Defendants, the Early Defendants took independent actions that prevented camps from working with the Plaintiffs, all as a direct and proximate result of the Early Defendants' wrongful conduct. See Complaint at ¶ 167. These detailed allegations, in the least, sufficiently allege a tortious interference claim that is not duplicative of the defamation claim.

In addition, the Early Defendants' argument that Plaintiffs have not alleged that that the Early Defendants' conduct amounting to an independent tort, and that Plaintiffs did not allege relationships with specific third parties, fails as well.

The Plaintiffs allege at paragraph 167 of the Complaint that "**Defendant Early's and Mid-Atlantic's wrongful withdrawal of the Mid-Atlantic's approval of Plaintiffs' camp – a blatant and wrongful exercise of Early's conflict of interest – is an independent wrongful act that goes beyond Defendants' defamation**." This allegation is not conclusory. In fact, paragraphs 108-109 of the Complaint allege that Defendant James Early unlawfully withdrew the approval of Plaintiffs' camp, which caused Plaintiffs, in the least, $53,946 in tuition fees. The Complaint explains that prior to the defamation, customers were signing up for Plaintiffs' Irish Dance camp on a daily basis. Complaint at ¶ 135. Yet, the Early Defendants' wrongful decision to withdraw the approval for Plaintiffs' camp tortuously constituted tortious interference with those contractual relations, and prospective business relations, because those customers were no longer able to attend

the Plaintiffs' camp.  See Complaint at ¶ 109.  Based on the above, Plaintiffs have sufficiently alleged a tortious interference with business relations claim that defeats this motion to dismiss.

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Early Defendants' motion to dismiss be denied in its entirety.

Dated: New York, New York
      April 19, 2021

**CATAFAGO FINI LLP**

By:  /s/ Tom M. Fini, Esq.
      Tom M. Fini, Esq.
      Adam Sherman, Esq.
      The Empire State Building
      350 Fifth Avenue, Suite 7710
      New York, NY 10118
      (212) 239-9669
      tom@catafagofini.com
      *Attorneys for Plaintiffs*

25